UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

BAHAA E. ISWED #272102,

    Plaintiff,

v.

PATRICIA CARUSO,
Director of Michigan Department of Corrections,

MARY BERGHUIS, Warden, LRF,
WRIGHT WADE, Inspector,
G. RILEY, Lieutenant,

    Defendants.

Case No. 1:08-cv-1118

HONORABLE PAUL L. MALONEY

---

**OPINION and ORDER**

**Overruling the Plaintiff's Objections;
Adopting the Report and Recommendation;
Denying Plaintiff's Application for a Preliminary Injunction Regarding Telephone Access**

**BACKGROUND**

Following his conviction for felony murder, Bahaa E. Iswed ("Iswed") is serving a life sentence in a Michigan state correctional institution. *See* Defendants' Brief in Opposition to Preliminary Injunction filed November 12, 2010 (Document 53) ("Defs' Opp"), Exhibit ("Ex") A (Offender Tracking and Information System record). In November 2004, Iswed began placing Romanian and Jordanian telephone numbers on his Telephone Agreement and Number List, *see*

Def's Opp Ex C.[1] When Iswed's calls failed to connect because the prisoner telephone system was programmed not to connect calls to countries other than those in North America, Mexico, and certain U.S. territories, Iswed submitted a letter to defendant Ryan Correctional Facility ("RCF") Inspector Wright Wade, who responded five days with a letter explaining that Michigan Department of Corrections ("MDOC") Policy Directive ("PD") 05.03.130 limited prisoner telephone calls to the USA, Canada, Mexico, Puerto Rico, the U.S. Virgin Islands, and Guam, and stated that the prison should not have approved the placement of those phone numbers on Iswed's list in the first instance if they were in other countries. *See* Defs' Opp, Ex D (Affidavit of Wright Wade executed November 20, 2010, hereinafter "Wade Aff"), Ex E (Iswed's August 5, 2005 letter to defendant Wade), and Ex F (Defendant Wade's August 10, 2005 letter to Iswed).

Iswed filed a grievance and pursued it through Steps I, II and III, but at each step the prison refused to process and consider the grievance because of its position that the content of prison policy is not grievable. *See* Defs' Opp Ex G (Iswed's Step I Grievance Form) and Ex H (Iswed's Step II and III Grievance Forms). The court notes that MDOC's position on this score is legally correct and recognized by current Sixth Circuit precedent, *see Pugh v. Caruso*, 2008 WL 1868990, *7 (W.D. Mich. Apr. 24, 2008) (Paul L. Maloney, C.J.) (citing *Harbin-Bey v. Rutter*, 420 F.3d 571, 581 (6th Cir. 2005) ("Prisoners may grieve the application of a policy directive if it affects them personally and involves a concern over which the MDOC has control, but they may not grieve the content of

---

[1] Iswed has not challenged the authenticity or admissibility of the documents submitted by the defendants, and the defendants present the sworn declaration of an MDOC legal-affairs manager that the documents are "records of regularly conducted activity" of MDOC "made at or near the time of the occurrences reflected, by a person with knowledge of those matters, or from information transmitted by a person with knowledge of those matters" and "kept in the regular course of business . . . ." Defs' Opp Ex E - Affidavit of MDOC Office of Legal Affairs Litigation Manager Linda Wittman executed November 10, 2010.

the policy itself.") (citing MDOC PD 03.02.130 ¶¶ E and F-2)). While awaiting a response to his Step III grievance, Iswed wrote a letter in August 2007 to defendant Warden Mary Berghuis, who responded with a letter stating that because his family lived outside the permitted calling area, he would have to use the regular United States postal mail to communicate with them, *see* Defs' Opp Exs I and J, rather than the prison telephone system. In August 2008 Iswed mailed a letter to the telephone company which provides service to MDOC, Defs' Opp Ex J, and he alleges that the company responded that the calling service-area restriction was an MDOC policy, not a corporate policy. Finally, in September 2008 Iswed mailed a letter to MDOC Director Caruso seeking a declaratory ruling on the PD (Defs' Opp Ex K), and the parties agree that Caruso did not respond, *see* Defs' Opp at 2.

**PROCEDURAL HISTORY AND NATURE OF THE CASE**

Proceeding *pro se*, Iswed filed the complaint in November 2008 (Doc 1), claiming that the defendants, all MDOC officials and employees, violated his rights under the First, Eighth and Fourteenth Amendments of the United States Constitution, committed the common-law tort of conversion, and otherwise violated state law, by refusing to allow him to use a pre-paid telephone card to call immediate family members who lived in Jordan and Romania. This court dismissed the complaint in January 2009 pursuant to 28 U.S.C. § 1915(g), holding that Iswed's federal claims failed to state a claim on which relief could be granted (Docs 4 and 5) and exercising its 28 U.S.C. § 1367 discretion to decline supplemental jurisdiction over his state-law claims. Iswed filed an appeal (Docs 7-8 and 10) with the U.S. Court of Appeals for the Sixth Circuit, which affirmed in part, reversed in part, and remanded to this court by opinion dated October 26, 2009 and mandate

issued November 16, 2009 (Docs 14-15), citing the less stringent pleading standards applicable to *pro se* litigants.

Specifically, the Court of Appeals determined that Iswed stated a claim on which relief might be granted under the First Amendment guarantee of freedom of speech/association, but did not state a viable Eighth Amendment "cruel and unusual punishment" claim or a Fourteenth Amendment Equal Protection claim, *see Iswed v. Caruso et al.*, No. 09-1245, Order at 3-5 (6th Cir. Oct. 21, 2010) (per curiam by Clerk of Court) (Martin, Norris, Gilman) (not on WestLaw or in F. App'x). The Circuit found that Iswed waived any arguments against the dismissal of his other claims because he failed to raise them on appeal, *see id.* at 1-2.

On remand, then, only Iswed's First Amendment Freedom of Association claim remained. By opinion and order issued on November 24, 2009, this court *sua sponte* dismissed the Free Association claim against five defendants – Embarq Payphone Services Inc., "Grievance Coordinator - Step 1" Marva Myles, "Grievance Coordinator - Step 3" James Armstrong, Warden Raymond D. Booker, and Deputy Warden William Ray – leaving four defendants in the case as listed in today's caption and ordering service of the complaint on the same (Docs 16 and 17). The four remaining defendants jointly moved to dismiss the Free Association claim, or for summary judgment on that claim (Docs 27-28) in January 2010, Iswed filed two opposition briefs (Docs 32-33) in February 2010 and a supplemental opposition brief (Doc 37) in June 2010, and in July 2010 the Magistrate Judge issued a Report and Recommendation ("R&R") recommending denial of the defendants' motion (Doc 42). Because the defendants failed to file any objections, this court issued an opinion and order adopting the R&R in August 2010 (Doc 43).

First, this court agreed with the Magistrate Judge that the Rule 12(b)(6) motion to dismiss

the First Amendment Free Association claim was "a waste of time", as our Court of Appeals had already specifically held that Iswed has stated a First Amendment free-association claim on which relief could be granted, and the defendants did not show any extraordinary reason not to apply the law-of-the-case doctrine and the mandate rule and adhere to that determination. Second, this court agreed with the Magistrate Judge that the defendants had not created a record sufficient to secure summary judgment on the Free Association claim, writing as follows:

> As for the defendants' motion for summary judgment, the defendants contended that the MDOC policy prohibiting prisoners from telephoning foreign countries is rationally related to at least two legitimate penological interests, namely avoiding extra expense and ensuring that prisoners cannot avoid effective monitoring by speaking in foreign languages which the monitors cannot understand. In support of this contention, however, the defendants filed no admissible evidence, merely asserting the purported legitimate interests in their brief. As the Magistrate correctly notes, "it is well settled in our circuit that "'[a]ssertions by counsel do not constitute probative evidence.'" *JDC Mgmt., LLC v. Reich*, 644 F. Supp.2d 905, 929 with n. 19 (W.D. Mich. 2009) (quoting *In re Cohara*, 324 B.R. 24, 28 (6th Cir. BAP 2005) * * * ).
>
> The defendants did submit exhibits intended to support their assertion that the foreign-calling restriction is rationally related to legitimate penological interests. Those exhibits are inadmissible, however, because they are not authenticated, e.g., by sworn affidavit or deposition testimony . . . . [U]nauthenticated documents did not meet the requirements of FED. R. CIV. P. 56(e) and so may not be considered on summary judgment. *See also Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009) . . . .

*Iswed v. Caruso*, No. 1:2008-cv-1118 Doc. 43, 2010 WL 3385947, *3 (W.D. Mich. Aug. 25, 2010) (Maloney, C.J.). As directed by the court, the remaining four defendants filed an answer to the complaint in September 2010 (Doc 44) and the parties filed a joint status report on November 1, 2010.

On October 28, 2010, plaintiff Iswed filed the instant application for a preliminary injunction (Docs 47-48) directing defendant MDOC Director Caruso to afford him the use of a telephone at least twice per month to call his relatives in Romania and Jordan, pending the final disposition of

this action. On November 12, 2010 the defendants timely filed an opposition brief (Doc 53), and on November 28, 2010 the Magistrate Judge issued an R&R recommending denial of Iswed's application (Doc 55). Iswed filed objections on February 20, 2011 (Doc 60) which the court treats as timely, and the court has not ordered the defendants to respond to the objections.[2] For the reasons which follow, the court will overrule Iswed's objections, adopt the well-reasoned R&R, and deny Iswed's PI application.

**DISCUSSION**

Preliminarily, the court agrees with the Magistrate Judge's statement of our circuit's standard for preliminary injunctive relief. *See* R&R at 1-02 (citing *Leary*, 228 F.32d at 736); *see also Hunter v. Hamilton Cty. Bd. of Elections*, Nos. 10-4481, 11-3059 and 11-3060, – F.3d –, –, 2011 WL 242344, *21 (6th Cir. Jan. 27, 2011) (citing *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)). Iswed alleges that because the prison allows him to send letters to his family but does not allow him to receive mail in response, depriving him of the right to call his family on the telephone leaves him with no means of receiving communications from them at all, causing him a host of adverse consequences such as emotional distress, nightmares, cold sweats, migraine headaches, depression, and anxiety attacks, *see* P's Mot (Doc 47) at 1-2 and P's Br (Doc 48) at 2 and Declaration of Bahaa E. Iswed signed October 26, 2010 ("P's Dec") ¶¶ 1-3, and leaving him to worry constantly that he might die, or that a family member might die, without

---

[2] On December 14, 2010 the defendants filed a motion to dismiss or for summary judgment on the Free Association claim (Docs 56-57). With an extension of time, Iswed filed an opposition brief (Doc 66) on January 31, 2011. The time for the defendants to file a reply brief has expired, and they neither filed a reply nor sought an extension of time in which to do so. The defendants' dispositive motion is ripe and remains pending before the Magistrate Judge for an R&R.

ever speaking with each other again, P's Br at 4 and P's Dec ¶ 3. Iswed argues that the pain of being unable to speak with each other is exacerbated by the travails which his relatives are suffering in Jordan and Romania, P's Br at 5. The defense responds that contrary to Iswed's accusation, he has been free, and remains free, to send paper mail to his family in Jordan and Romania, subject only to generally applicable MDOC policies, and thus he has greatly overstated the harm which he will suffer if the court does not require MDOC to let him call those relatives, *see* Defs' Opp at 4-5.

As for the balance-of-the-harms analysis, Iswed points out that there are telephones in his unit which are already set up for debit-card and "collect" calling, and he alleges that MDOC already takes prisoners into an office to use a telephone there when an emergency calls for it, P's Br at 5-6. Iswed points as well on MDOC's PD 05.03.130, which provides in pertinent part that where the prison cannot make arrangements with a telephone company for collect calls or for the use of pre-paid calling service, prisoners shall still be allowed emergency use of the phone. *See* P's Br at 6 (quoting PD 05.03.130(G)). Iswed also points to MDOC's answer, which he says does not deny that the same policy directive, PD 05.03.130, "allows any other country, besides the United States, Canada, Mexico, Puerto Rico, the Virgin Islands, and Guam to receive collect or pre-paid phone calls in *non-emergency* situations", P's Br at 6 (providing no citation to any particular subsection of the policy directive).

Anticipating MDOC's contention that it has a legitimate concern about the expense of his calls abroad, Iswed emphasizes that he has offered to buy a pre-paid telephone calling card to ensure that the prison never incurs any expenses for his calls to Jordan and Romania, *see* P's Mot at 3 ¶ 5, and he notes the Magistrate Judge's earlier written observation that "Defendants do not attempt to explain how the incurring of 'extra expenses' provides a rational basis for denying Plaintiff access

to long-distance calls, when he has offered to use a pre-paid card covering all expenses", P's Br at 4 (quoting Doc 42 R&R at 3 n.1).

Although Iswed also anticipates MDOC's contention that it has a legitimate security concern about him holding telephone conversations in languages which prison personnel cannot understand and therefore cannot monitor, *see* P's Mot at 2 ¶ 2, his motion brief and objections alike do not rebut that contention. Rather, Iswed merely cites *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994) for the generalized and unqualified proposition that "there is no legitimate government purpose to be attached [sic] by not allowing reasonable access to the telephone, and . . . such use is protected by the First Amendment." P's Br at 3-4. Finally, Iswed contends that the public interest would be served by issuance of a preliminary injunction affording him telephone access twice per month because "'respect for the law, particularly by officials responsible for the administration of the state's correctional system, is in itself a matter of the highest public interest'", P's Br at 8 (quoting *Duran v. Anaya*, 642 F. Supp. 510, 527 (D.N.M. 1986) and citing *Llewelyn v. Oakland Cty. Prosecutor's Office*, 402 F. Supp. 1379, 1393 (E.D. Mich. 1975) ("the Constitution is the ultimate expression of the public interest")).

In response to Iswed's concern about never having the opportunity to speak with family members before they pass away, defendant MDOC cogently reasons as follows:

> Plaintiff bases this "emergency" classification on his uneasiness that he will not be able to communicate with his family members by telephone before he or one of them dies. [But] uncertainty about theoretical demise cannot be deemed an emergency as that argument could be made by every prisoner at any time. Unless Plaintiff is able to demonstrate knowledge regarding the failing health of a family member [whom] he wishes to contact, his emergency argument is unsubstantiated. To determine his families' [sic] current health status, Plaintiff is encouraged to send letters to his family members and ask for their response in English.

Defs' Opp to PI at 6. In support of MDOC's contention that it has a legitimate penological interest

in restricting prisoner calls to the countries listed in the policy directive, and in restricting even those calls to the English language, Inspector Wade explains the Michigan prison system's procedures and its lack of relevant resources as follows:

> Prisoner phone calls are subject to monitoring by MDOC staff. In fact, each facility must display a sign notifying prisoners that each call is being recorded. The content of a recommended fifty calls per month are [sic] monitored. The determination as to which calls are monitored is done randomly unless there is a reason to suspect [that] the content of a particular phone call may have a negative impact on the facility. If, during a phone call, a prisoner speaks in a language other than English, monitoring is more likely to occur because staff is unable to determine if the conversation's content may negatively impact [sic] the facility, as MDOC monitoring staff is unable to understand the communication. A prisoner may then be advised to speak in English to ensure the safety of the institution. If the prisoner ignores the request, further communication between the prisoner and the recipient of the phone call my be terminated.
>
> MDOC staff does all monitoring of prisoner phone calls. MDOC does not hire translators to monitor prisoner phone calls. Many MDOC staff members are multilingual, and their ability to speak another language allows them to monitor calls spoken in the languages they know. The language typically understood by these staff members is Spanish, so Spanish-speaking prisoners are often permitted to speak Spanish during their telephone calls.
>
> During the dates involved in the present lawsuit, MDOC employed Spanish[-]speaking employees whose duties included monitoring phone calls of Spanish[-]speaking prisoners. These employees were not hired specifically to monitor phone calls. The employees' ability to speak Spanish was merely helpful in monitoring phone call, and MDOC put their abilities to use in that regard. *To the best of my knowledge, no staff members at RCF [the Ryan Correctional Facility, where Iswed was incarcerated] speak Arabic, Adyghe, Armenian, Chechen, Domari, Kabardian, Romanian, Romani, Hungarian, Ukrainian, German [sic], or any languages commonly spoken in Jordan and Romania besides English*.

Doc 53-4, Wade Aff ¶¶ 7-9 (italics added). Another MDOC employee logically and plausibly explains the risks which would be posed by allowing prisoners, such as Iswed, to place telephone calls to countries where the native languages are not English or where the conversation is likely to take place in a language which available MDOC personnel cannot understand:

> MDOC employees monitor prison phone calls to ensure prisoners are not continuing criminal enterprises outside prison walls while incarcerated. Furthermore, monitoring prisoner phone calls helps ensure safety within prison walls by protecting against prisoner

-9-

> plots with those [who are] not incarcerated to violate MDOC policies against possession of contraband, escape, extortion of the public or families of other prisoners, and other policies pertaining to the maintenance of prison security.
>
> * * *
>
> If MDOC allows phone calls to countries not included in PD 05.03.130, the [e]ffect would be a decrease in prison security in that MDOC employees may not speak the language required to properly monitor these phone calls.

Doc 53-12, Affidavit of MDOC Correctional Facility Administration Operations Administrative Assistant Cheryl Groves executed November 10, 2010 ("Groves Aff") ¶¶ 4 and 6. Moreover, the same MDOC employee points out, without substantiated contradiction from Iswed, "[o]ther means are available for prisoners to contact their families. A prisoner is free to communicate with family members via the prison mailing system," Groves Aff ¶ 9.

As the Magistrate notes, R&R at 2 (citing *Pell*, 417 U.S. at 822), a prisoner retains only those rights which are consistent with his status as a prisoner and with the correctional system's legitimate penological objectives, *see also Bazetta v. McGinnis*, 430 F.3d 795, 804 (6th Cir. 2005) (upholding MDOC regulation which prohibited almost all visitation for prisoners who were administratively found guilty of two or more major-misconduct violations involving drug abuse, holding that regulation did not violate First Amendment or Fourteenth Amendment Due Process rights) (citing *Pell*). Specifically, the Magistrate is right that prisoners do not have any First Amendment right to telephone use *per se*, R&R at 2 (citing out-of-circuit decisions), *cf. Sickles v. Campbell Cty., Kentucky*, 501 F.3d 726, 729 (6th Cir. 2007) (Gibbons, Sutton, Chief S.D. Ohio D.J. Beckwith) (holding that the prison did not violate free-speech rights by withholding a portion of money which inmates' relatives had sent for their canteen accounts (in order to defray part of the cost of booking, room and board), notwithstanding that inmates might have spent the withheld money making telephone calls).

As the Magistrate also rightly notes, R&R at 2, the telephone is but one means of exercising any limited constitutional right to communicate with people outside the prison which the prisoner may have, *cf., e.g., Cardona-Sandoval v. Rushing*, 2010 WL 1485414, *1 (N.D. Ohio Apr. 13, 2010) (Sara Lioi, J.) (denying prisoner's application for preliminary injunction and dismissing complaint which had claimed that county tax on prisoner telephone calls violated the First Amendment, stating "As there is no constitutional right [for a prisoner] to use the telephone, it follows that there is no right to use the telephone without charge."). Accordingly, the prison may constitutionally limit the nature and extent of a prisoner's access to the telephone, so long as the restrictions are rationally or reasonably related to legitimate penological interests. In addition to the authorities cited by the R&R at 3, *see Antonelli v. Walters*, 2009 WL 921103, *11 (E.D. Ky. Mar. 31, 2009) (Gregory Van Tatenhove, J.) (collecting cases, including *Benzel v. Grammar*, 869 F.2d 1105, 1108 (8th Cir. 1989) (upholding pre-approved calling list of no more than three persons for inmates in disciplinary segregation)). As described by the Magistrate Judge, Iswed has not provided any reasoning or precedent suggesting that MDOC's geographical/linguistic limitation on prisoner telephone calling fails this deferential test.

In short, for the reasons stated by MDOC as quoted herein, and the reasons discussed by the Magistrate Judge, the court finds that Iswed is not likely to succeed on the merits of his claim, and that none of the other three factors favors the issuance of preliminary injunctive relief either.

Finally, because the court concludes that Iswed has not demonstrated entitlement to a preliminary injunction, there is no need to consider his argument (P's Br at 8-9) that he should not be required to post a bond as security for said relief under FED. R. CIV. P. 65(c), which provides, "No

. . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." *Accord Coalition for Economic Equity v. Wilson*, 192 F.3d 692, 698 n.4 (9th Cir. 1997) (after holding that district court abused its discretion by issuing a preliminary injunction, the panel stated "We need not address whether the district court erred by failing to require plaintiffs to post a bond in light of our conclusion on the merits."); *Warren v. Rodriguez-Hernandez*, 2010 WL 3668063, *1 n.4 (N.D. W.Va. Sept. 15, 2010) (Frederick P. Stamp, Jr.) ("Because this Court is denying the plaintiffs' request for injunction [sic] relief, this Court does not need to consider the issue of bond."); *Gaule v. Meade*, 2005 WL 697503, *2 (D. Alaska Mar. 24, 2005) (Beistline, J.) ("[T]he Court denies Plaintiff's motion for a Preliminary Injunction. As such, the Court does not need to consider whether this is an appropriate case for waiving the bond requirement.").[3]

## ORDER

Plaintiff's objections [document #60] are **OVERRULED**.

The Report & Recommendation issued November 28, 2010 [document #55] is **ADOPTED**.

Plaintiff's application for a preliminary injunction [document #47] is **DENIED**.

---

[3]  *Cf. Dos Santos v. Columbus-Cuneo-Cabrini Medical Center*, 684 F.2d 1346, 1351 n.7 (7th Cir. 1982) (Bauer, Wood, <u>Cudahy</u>) (after vacating preliminary injunction upon determining that the applicant failed to satisfy at least three of the four prerequisites for such relief, the panel stated, "The district court in the instant case did not address in its preliminary injunction order the defendants' request for a bond. Given our disposition, we need not decide whether this omission constitutes reversible error.").

This order denying the application for preliminary injunction is an interlocutory order, but it may be immediately appealable. *See Stanton v. Hutchins*, 2010 WL 882822, *12 (W.D. Mich. Mar. 8, 2010) (citing *Overstreet v. Lexington-Fayette Cty. Urban Gov't*, 305 F.3d 566, 572 (6th Cir. 2002)) (citations omitted).

**IT IS SO ORDERED** on this 12th day of April 2011.

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge